JS-44
(Rev.1/05 DC)

## CIVIL COVER SHEET

### I (a) PLAINTIFFS
Laurie Bay
17320 Moore Road, Boyds, MD 20840

88888

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF** Montgomery
(EXCEPT IN U.S. PLAINTIFF CASES)

### DEFENDANTS
Washington Metropolitan Transit Authority, et. al.
600 5th Street, NW, Washington, D.C. 20001

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT Washington, Distri
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**
L. Saundra White, Esq.
3540 Crain Highway, #107
Bowie, MD 20716
(301) 574-3547

Case: 1:07-cv-02258
Assigned To: Huvelle, Ellen S.
Assign. Date: 12/17/2007
Description: Employ Discrim.

### II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff
● 3 Federal Question (U.S. Government Not a Party)
○ 2 U.S. Government Defendant
○ 4 Diversity (Indicate Citizenship of Parties in item III)

### III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ● 4 |
| Citizen of Another State | ● 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

### IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and **one** in a corresponding Nature of Suit)

**○ A. Antitrust**
☐ 410 Antitrust

**○ B. Personal Injury/Malpractice**
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

**○ C. Administrative Agency Review**
☐ 151 Medicare Act
**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**○ D. Temporary Restraining Order/Preliminary Injunction**
Any nature of suit from any category may be selected for this category of case assignment.
*(If Antitrust, then A governs)*

**○ E. General Civil (Other)    OR    ○ F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ G. *Habeas Corpus/ 2255* | ☒ H. *Employment Discrimination* | ○ I. *FOIA/PRIVACY ACT* | ○ J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☒ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ K. *Labor/ERISA (non-employment)* | ○ L. *Other Civil Rights (non-employment)* | ○ M. *Contract* | ○ N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**
- ☒ 1 Original Proceeding
- ○ 2 Removed from State Court
- ○ 3 Remanded from Appellate Court
- ○ 4 Reinstated or Reopened
- ○ 5 Transferred from another district (specify)
- ○ 6 Multi district Litigation
- ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
Employment discrimination, hostile work environment and retaliation under 42 USC 2000e

**VII. REQUESTED IN COMPLAINT**  ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   DEMAND $ 350,000.00   Check YES only if demanded in complaint
JURY DEMAND: YES ☒  NO ☐

**VIII. RELATED CASE(S) IF ANY**  (See instruction)  YES ☐  NO ☐  If yes, please complete related case form.

DATE 12/14/2007  /17  SIGNATURE OF ATTORNEY OF RECORD /s/ [signature]

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I. COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III. CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV. CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the *primary* cause of action found in your complaint. You may select only *one* category. You *must* also select *one* corresponding nature of suit found under the category of case.

VI. CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

CLERK
US DISTRICT & BANKRUPTCY COURT
2007 DEC 15 AM 12: 45
RECEIVED

LAURIE C. BAY )
    Plaintiff )
)
v. )
)
)
)
)
)
WASHINGTON METROPOLITAN )
AREA TRANSIT AUTHORITY )
)
JOHN B. CATOE, JR. )
)
General Manager )
Jackson Graham Building )
600 Fifth Street, N.W. )
Washington, D.C. 20001 )
    Defendants )

Case: 1:07-cv-02258
Assigned To : Huvelle, Ellen S.
Assign. Date : 12/17/2007
Description: Employ Discrim.

JURY ACTION

## COMPLAINT

(Employment retaliation, hostile work environment and discrimination in violation of the Federal Civil Rights Act)

## JURY TRIAL DEMAND.

Plaintiff Laurie C. Bay by and through her counsel hereby files this Complaint against Defendants John B. Catoe, Jr., General Manager and the Washington Metropolitan Area Transit Authority (WMATA) for employment discrimination, hostile work environment and retaliation in violation of Title VII of the Federal Civil Rights Act and states as follows:

## PARTIES

1. Plaintiff Laurie C. Bay is a former Senior Labor Relations Officer that was employed

1

with WMATA from February 2003 until May 2007.

2. Defendant John B. Catoe, Jr. is the General Manager for WMATA.

3. Defendant WMATA is also known as the Washington Metropolitan Area Transit Authority and was created as an interstate compact created by the United States Congress between the Commonwealth of Virginia, the State of Maryland and the District of Columbia to provide, inter alia, transit services in the Washington Metropolitan Area Transit Zone. Defendant WMATA is an employer as defined in 42 U.S.C. §2000e(b) and 29 U.S.C.§630(b).

4. Defendant WMATA does business in Washington, D.C. and maintains its headquarters at 600 Fifth Street, N.W.,Washington, D.C. WMATA employed Plaintiff from February 2003 until May 2007.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over this action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seg. Plaintiff's Right to Sue Letter is dated September 17, 2007 and Plaintiff received the Right to Sue Letter on September 19, 2007.

6. Venue is proper in this judicial district and this Division pursuant to 28 U.S.C. §1391 in Defendant's headquarters is located in Washington, D.C., and the acts and omissions of Defendant alleged below were committed within Washington, District of Columbia and within the geographical limits of the District of Columbia Division of this Court. Also, Plaintiff's work site with Defendant was located in Washington, D.C.

## ALLEGATIONS OF FACT COMMON TO ALL CLAIMS

7. Defendant John B. Catoe, Jr. is the General Manager for WMATA and his current place of employment is at 600 Fifth Street, NW, Washington, D.C. 20001.

2

8. Plaintiff (Caucasian Female) was employed with Defendant WMATA from February 2003 until May 2007. Plaintiff gave her resignation on or around the later part of May 2007 to be effective two weeks later in June 2007. Plaintiff worked under D. Richard Froekle (Caucasian Male), who was and remains the Director of the Office of Employee and Labor Relations for Defendant.

9. Upon receipt of Plaintiff's resignation notice, Mr. Froelke immediately placed Plaintiff on forced administrative leave and barred her from entry to any of WMATA's work sites.

10. Matilda Brodnax (Female and African American), the former Manager of Arbitration and Mediation Administration, was Plaintiff's supervisor when Plaintiff first arrived at WMATA. Ms. Brodnax had no notable supervisory experience prior to becoming a supervisor at WMATA.

11. Upon Ms. Brodnax's resignation from WMATA, Defendant announced her position (Manager of Arbitration and Mediation Administration) and the announcement indicated the position requirements included inter alia supervisory experience, and arbitration and mediation experience.

12. Plaintiff, along with Misty Oratokhai and one other applicant, were selected to be interviewed for the Manager's position. Of the three applicants interviewed for the position, Plaintiff was the only one currently employed by Defendant.

13. Prior to filling this position, Plaintiff performed the job duties of Ms. Brodnax when she resigned. In November 2006, Respondent requested acting pay for performance of Ms. Brodnax's former job duties.

14. Even though Plaintiff had more significant experience than Mrs. Oratokhai,

Defendant hired Mrs. Oratokhai. Also, Mrs. Oratokhai was hired at the rate of $108,306.00 annually which was more than $21,000.00 higher than Plaintiff's annual salary.

15. Thereafter, Plaintiff filed a grievance and filed a Public Access to Records Policy (PARP) request because Plaintiff believed she was better qualified for the manager position than Mrs. Oratokhai.

16. Plaintiff was also the only internal candidate interviewed for the position. Under Defendant's policy, Defendant, "encourages the promotion of qualified individuals within the Authority."

17. Shortly after Plaintiff filed her grievance and PARP request, Defendant transferred Plaintiff to the Bladensburg Road office and indicated that Plaintiff would receive acting pay for performing the job duties of a Senior Labor Relations Officer.

18. After Plaintiff's transfer to the Bladensburg Road office, Plaintiff's workload increased. She continued to do her former job of Labor Relations Officer, assumed the duties of a former Labor Relations Officer, Jerome Artis (African American Male previously assigned to the Bladensburg Road office) and performed one half of the arbitration responsibilities for the Office of Employee and Labor Relations.

19. On January 25, 2007, Plaintiff filed a discrimination complaint with Defendant's Office of Civil Rights based on race and disparate treatment.

20. During the early part of February 2007, Plaintiff requested the acting pay for Senior Labor Relations Officer from Mr. Froelke. Mr. Froelke denied her request even though Plaintiff was assigned the work previously performed by two employees.

21. On February 9, 2007, Plaintiff filed her original complaint with EEOC based on race and disparate treatment.

4

22. In February 2007, Mr. Froelke, informed Plaintiff that she would be supervising Seetal Patel.

23. In February 2007, it became apparent that Mr. Froelke had no intentions of ever providing Plaintiff with any acting pay but instead falsely enticed Plaintiff to transfer to the Bladensburg Road office so as to be out of his proximity.

24. On or about February 14, 2007, Mr. Froelke, attempted to conduct a promotional interview process for the position of Senior Labor Relations Officer without considering the Plaintiff's application for the position.

25. On March 5, 2007, a new promotional increase range went into effect that provided that employees could obtain a salary increase from 5% to 20%, or more if approved by the General Manager, upon promotion to a higher position.

26. Mr. Froelke provided Plaintiff with only a 6.5 % salary increase when she was selected and promoted to the position of Senior Labor Relations Officer in March 2007, while providing similarly-situated African American employees with at least a minimum of an 8% salary increase.

27. Plaintiff's performance evaluation consistently exceeded expectations and she continued to arbitrate cases that were suppose to be arbitrated by Ms. Oratokhai. The remainder of the arbitration caseload was assigned to the only other Caucasian Labor Relations Officer.

28. On or around May 15, 2007, Mr. Froekle submitted an email to the entire staff, stating that Plaintiff and the other Caucasian labor relations officer were not performing their share of the workload and requested them to immediately turn around the low statistics with respect to Local 689 cases. In addition to handling the arbitration workload, Plaintiff and the other Caucasian labor relations officer were responsible for handling all Local 689 grievances.

Local 689 grievances make up approximately 95% of the grievance workload handled by the Office of Employee and Labor Relations.

29. During the time period in question, John Marshall (African American Male) was the only other labor relations officer in the Office of Employee and Labor Relations. Mr. Marshall, was assigned to handle the other 5% of the grievance workload.

30. Mr. Marshall was promoted, without competition, to the position of Senior Labor Relations Officer from Labor Relations Officer in or around December 2002 by Mr. Froelke and former Deputy General Manager of Workforce Development and Administration William F. Scott (African American Male). Throughout his tenure at WMATA, Mr. Marshall has not been assigned to handle any arbitration cases. Indeed, when it was suggested by Plaintiff, immediately after Ms. Brodnax's departure, that an arbitration case should be assigned to Mr. Marshall, Mr. Froelke responded , "[n]o, he could not handle it." Indeed, it was and is common knowledge throughout WMATA that Mr. Marshall is not competent to perform the duties he is assigned and that he regularly sleeps on the job.

31. On or around May 3, 2007, Defendant laid off Mrs. Oratokhai and eliminated the manager's position instead of considering Plaintiff for the position.

32. Upon the departure of Mrs. Oratokhai, Plaintiff and the other Caucasian labor relations officer were assigned to take over the few cases that Mrs. Oratokhai handled. Mr. Marshall, the only non-Caucasian Senior Labor Relations Representative, was not required to assume any of Ms. Oratokhai's work.

33. Plaintiff provided her resignation on or around May 28, 2007.

34. Upon receipt of Plaintiff's resignation, Mr. Froelke placed Plaintiff on forced administrative leave and immediately ordered her out of the Bladensburg Road office without

any explanation or justification.

## COUNT I
## (DISCRIMINATION, HOSTILE WORK ENVIRONMENT AND DISPARATE TREATMENT BASED ON RACE )

35. Plaintiff incorporates by reference the allegations in all proceeding paragraphs as if restated fully herein.

36. Plaintiff is a Caucasian Female and a licensed attorney, and has approximately 12 years of experience as a labor relations officer.

37. On or about September 1, 2006, Ms. Matilda Brodnax (African American Female) resigned her position of Manager of Arbitration in the Office of Employee and Labor Relations. Ms. Brodnax, a licensed attorney, was first hired by WMATA in the Office of General Counsel on or about July 2001. On or about December 2002, she was competitively selected for the position of Manager of Arbitration. Ms. Brodnax, at the time, had no previous notable supervisory experience.

38. WMATA hired the Plainitff as a Labor Relations Officer on or about February 10, 2003.

39. During her tenure as the Manager of Arbitration, Ms. Brodnax supervised, at most, two employees, Plaintiff and an administrative assistant.

40. During Ms. Brodnax's tenure, for the most part, Ms. Brodnax and Plaintiff each handled one half of the arbitration caseload for WMATA.

41. Following Ms. Brodnax's departure on or about September 1, 2006, Plaintiff assumed Ms. Brodnax's managerial responsibilities, including, but not limited to: preparing the monthly arbitration report; overseeing the arbitration hearing schedule and rescheduling hearings

7

as necessary; reviewing all grievance files invoked to arbitration and contacting witnesses to ensure their availability on hearing dates; ascertaining whether a particular grievance should be settled rather than arbitrated; ensuring arbitrations were assigned and handled properly, which included discussing the merits and strategy with the LRO assigned to the case; and supervising, overseeing the work of, and providing daily to guidance to the Labor Arbitration Specialist. Indeed, prior to her departure, Ms. Brodnax advised the Labor Arbitration Specialist, Kesha Copeland, that Plaintiff would be her supervisor until a new Manager of Arbitration was selected. Plaintiff also continued to perform her regularly assigned duties as Labor Relations Officer.

42. In September 2006, the vacancy announcement for the position of the Manager of Arbitration was posted and advertised internally and externally of WMATA. The vacancy announcement and the position description for the Manager of Arbitration were both identical to the vacancy announcement and position description utilized when Ms. Brodnax was hired for the position There were no apparent changes made to the duties and responsibilities of the position upon Ms. Brodnax's departure.

43. During October 2006, three candidates were interviewed for the vacant position of Manager of Arbitration. The candidates included Plaintiff (Caucasian Female), Misty Oratokhai (African American Female) and a Caucasian Male. Plaintiff was the only candidate interviewed who was currently an employee of WMATA.

44. Pursuant to WMATA policy and procedure, in order to be interviewed for a position, a candidate must meet the minimum qualifications of the position.

45. Pursuant to WMATA Policy No. 1.2, Personnel Philosophy, I.D., "[t]he Authority encourages the promotion of qualified individuals within the Authority."

8

46. The interviews for the Manager of Arbitration were conducted by a three-member panel which included Mr. Froelke (Caucasian Male), Director of Office of Employee and Labor Relations; Gregory Boykin (African American Male), Director of the Office of Administrative Programs and Services, and Teresa Bailey (African American Female), Director of Civil Rights.

47. Prior to serving on the interview panel, Gregory Boykin was promoted, without competition, to the position of Director of the Office of Administrative Programs and Services by former Deputy General Manager of Workforce Development and Administration William F. Scott (African American Male).

48. Teresa Bailey, Director of Civil Rights, departed her employment at WMATA in January 2007. At the time of her resignation, Ms. Bailey had various complaints, including complaints of discrimination, filed directly against her by subordinates in the Office of Civil Rights.

49. Following the interview process, Mr. Froelke sent a memorandum to the Office of Human Resources recommending the hiring of Ms. Oratokhai (African American Female) for the position of Manager of Arbitration at the highest rate for the grade level.

50. Ms. Oratokhai was offered the position and accepted at the rate of $109,306 annually. Ms. Oratokhai officially assumed the position on or about December 15, 2006. At the time, Plaintiff's salary was approximately $87,000.00.

51. Despite Plaintiff's request, Mr. Froelke denied Plaintiff acting pay for performing the work of the Manager of Arbitration from on or about September 1, 2006 until mid-December 2006 when Ms. Oratokhai assumed the position.

52. Around or about the same time Mr. Froelke denied Plaintiff's request for acting pay, he requested in writing of his direct supervisor that acting pay be issued to Denise Mitchell

9

(African American Female), Labor Relations Specialist.

53. Subsequent to Ms. Brodnax's resignation and at the time of Ms. Oratokhai's selection, Mr. Froelke reported directly to Brender Gregory (African American Female) who replaced William F. Scott as the Assistant General Manager of Workforce Development and Administration on or about July 2006.

54. Ms. Gregory officially resigned from WMATA on or about December 31, 2006. During her tenure as Assistant General Manager, it was known that Ms. Gregory made exceptions to WMATA policy by giving out of cycle pay raises and acting pay assignments to African American employees.

55. According to documents provided by the WMATA's Office of General Counsel, as of April 11, 2007, the number of African American females holding managerial or supervisory positions at WMATA was approximately 182. The number of Caucasian females holding managerial or supervisory positions at WMATA was approximately was 36.

56. At the time of Ms.Oratokhai's selection, the vacancy announcement and job description for the position of Manager of Arbitration both specified that the selectee must have at least seven (7) years of "progressively responsible experience in the technical, administrative and analytical areas dealing with collective bargaining to include arbitration/mediation matters and the administration of negotiated labor agreements in a large organization."

57. According to WMATA documents, Ms. Oratokhai possessed less than seven (7) years of the required experience.

58. At the time of Ms. Oratokhai's selection, Plaintiff had worked successfully as a Labor Relations Officer at WMATA for nearly four (4) years. Throughout Plaintiff's tenure at WMATA, she received "exceeds expectations" on her annual performance evaluations. In the

10

one instance she received a "satisfactory" rating, she was advised by management that her rating and the ratings of others in the office were artificially lowered to match the monies available for raises that particular year.

59. At the time of Ms. Oratokhai's selection, Plaintiff possessed over twelve (12) years of the experience specified for the position of Manager of Arbitration, including over nine (9) years as a labor relations specialist for two major public transportation agencies.

60. Subsequent to Ms. Oratokhai's hiring, Mr. Froelke changed the job responsibilities for the position of Manager of Arbitration dramatically. Again, however, the position description and vacancy announcement had not been changed from the prior incumbent.

61. Under the new job duties, Ms. Oratokhai was not expected to first chair arbitration proceedings. Instead, she was required to "assist" or second-chair Plaintiff and another Caucasian employee in the preparation and presentation of their respective arbitration cases.

62. Ms. Oratokhai, in fact, told another employee that when she was hired she was told that she would not have to first chair an arbitration case for three or four months. Ms. Oratokhai made this comment in dismay after she was required by Mr. Froelke to first chair an arbitration matter prior to the expiration of three months after her hiring.

63. Prior to Ms. Oratokhai's hiring, Plaintiff had not required assistance in the preparation and presentation of her assigned arbitration cases. Nor had she ever been told by her superiors that her work was not sufficient in this regard.

64. Subsequent to Ms. Oratokhai's hiring, the majority of arbitration cases were no longer handled by the Manager of Arbitration and the Plaintiff, but rather by the Plaintiff and another Caucasian Labor Relations Officer, with a nominal number of cases assigned directly to Ms. Oratokhai.

65. Despite Mr. Froelke's change in the manager's job duties subsequent to Ms. Oratokhai's hiring, Ms. Oratokhai never assisted Plaintiff nor the other Caucasian labor relations officer in the preparation or presentation of their cases as she was assigned.

66. Upon her hiring, Ms. Oratokhai was assigned to supervise only one employee, Labor Arbitration Specialist, Kesha Copeland (African American Female). The other manager in the Office of Employee and Labor Relations, a Caucasian Male, upon Ms. Oratokhai's hiring, was given additional employees to supervise, including Plaintiff.

67. Shortly after her hiring, Ms. Oratokhai demonstrated that she was unable to properly supervise the one employee under her authority. Within her six months as manager, Ms. Oratokhai attempted to terminate her only subordinate, Ms. Copeland, and later tried to extend Ms. Copeland's probationary period and place her on a corrective action plan. In each instance, Ms. Oratokhai's proposed action against Ms. Copeland was overruled in its entirety by Mr. Froelke.

68. In the few cases she did handle, it was readily apparent that Ms. Oratokhai had little, if any, experience handling arbitration cases as first chair. Official transcripts from these proceedings reveal that she had to be coached regularly by the neutral arbitrator deciding the case.

69. In addition to handling the arbitration caseload, Plaintiff and the other Caucasian Labor Relations Officer were responsible for handling all Local 689 Step 4 grievances. Local 689 Step 4 grievances amount to approximately ninety-five (95) percent of the grievance workload in the Office of Employee and Labor Relations.

70. Prior to Ms. Oratokhai's selection, the work performed by Plaintiff and the other Caucasian Labor Relations Officer was assigned to four (4) employees: the Manager of

12

Arbitration (an African American female), the Plaintiff, the other Caucasian Labor Relations Officer and an African American labor relations officer.

71. Subsequent to Ms. Oratokhai's hiring, although Plaintiff's and another Caucasian Labor Relations Officer's workload significantly increased, neither employee received additional salary for several months.

72. The prior Manager of Arbitration regularly prepared and presented arbitration cases at hearing.

73. When Plaintiff questioned Mr. Froelke as to why she was not selected for the Manager's position, Mr. Froelke responded that the interview scores were very close, but that Ms. Oratokhai possessed more supervisory experience.

74. Plaintiff asserts that Mr. Froelke's rationale for hiring Ms. Oratokhai is merely pretext. Again, as the duties existed when performed by Ms. Brodnax, the majority of her work entailed preparing and presenting arbitration cases.

75. Moreover, although, according to Mr. Froelke, Plaintiff did not possess the necessary supervisory experience required for the manager position, shortly after Ms. Oratokhai's hiring, Plaintiff was assigned to "mentor" a new employee who had recently finished a master's program. This assignment was made by Mr. Froelke, himself.

76. In making this assignment, Mr. Froelke advised Plaintiff that he wanted this new employee to "assist" Plaintiff in "grievance research, drafting of decisions, preparation for arbitration, and attendance at grievance meetings and arbitration where possible given her work schedule." Mr. Froelke further stated to Plaintiff that through this assignment he wanted the new employee to "begin" to learn the full range of responsibilities relating to the handling of grievances and arbitrations and that working with Plaintiff would be a "good learning

experience" for this employee.

77. By this assignment, Plaintiff was, in essence, required, in addition to her already increased workload, to supervise and mentor an employee new to the process of handling grievances and arbitrations.

78. The new employee in question was hired by WMATA's Office of Compensation. When determining her work schedule in a given week, said employee would consult with Plaintiff, as her defacto supervisor in the Office of Employee and Labor Relations and the Manager of the Office of Compensation.

79. Aware of the work inequities, Mr. Froekle never effectuated a new written performance plan for the Plaintiff subsequent to Ms. Oratokhai's hiring and prior to the Plaintiff's resignation in late May 2007. Likewise, during the same time frame, Mr. Froelke failed to effectuate a new written performance plan for the other Caucasian employee whose workload had significantly increased with Ms. Oratokhai's hiring.

80. After Plaintiff filed discrimination complaints, Mr. Froelke stopped responding to Plaintiff's work-related emails. On other occasions, he failed to attend meetings with Plaintiff concerning labor relations matters.

81. On or around May 15, 2007, Mr. Froelke submitted an email to the entire staff, stating that Plaintiff and the other Caucasian labor relations officer were not performing their share of the workload and requested them to immediately turn around the low statistics with respect to Local 689 cases. In addition to handling the arbitration workload, Plaintiff and the other Caucasian labor relations officer were responsible for handling all Local 689 grievances. Local 689 grievances make up approximately 95% of the grievance workload handled by the Office of Employee and Labor Relations.

82. At the time, John Marshall (African American Male) was the only other labor relations officer in the Office of Employee and Labor Relations. Mr. Marshall was assigned to handle the other 5% of the grievance workload, but no arbitrations.

## COUNT II

### RETALIATION IN VIOLATION OF THE CIVIL RIGHTS ACT

83. Plaintiff incorporates by reference the allegations in all proceeding paragraphs as if restated fully herein.

84. Plaintiff disclosed her concerns regarding the selection of Mrs. Oratokhai in a grievance dated December 19, 2006 and requested Mrs. Oratokhai's personnel information pursuant to PARP.

85. Defendant never released Mrs. Oratokhai's personnel information, including but not limited to her employment application and resume.

86. Defendant denied Plaintiff's grievance and Defendant failed to consider Plaintiff's request to reconsider its denial of her grievance.

87. Shortly, after Plaintiff filed her grievance and Request for Information, Defendant immediately transferred her to the Bladensburg Road office.

88. Immediately after Plaintiff filed her internal civil rights complaint in January 2007, Defendant informed Plaintiff that she would not receive acting pay for performing work previously assigned to two Labor Relations Officers.

89. Immediately after filing her internal and external discrimination complaints, Mr. Froelke attempted to conduct the interview process for the position of Senior Labor Relations Officer without considering Plaintiff's application.

90. After filing discrimination complaints, Mr. Froelke stopped responding to Plaintiff's

work-related emails. On other occasions, he failed to attend meetings with Plaintiff concerning labor relations matters.

91. Upon appointment as a Senior Labor Relations Officer, Plaintiff was denied a reasonable salary increase and was only given a 6.5% salary increase while similarly-situated African American employees were given at least 8%.

92. Shortly, after Plaintiff filed her complaint with the Equal Employment Opportunity Commission, instead of terminating Ms. Oratokhai's employment under her probationary period, or for other reasons, Defendant laid off Mrs. Oratokhai, thus prohibiting Plaintiff or others from applying for Mrs. Oratokhai's manager position by abolishing it.

93. At the time of Ms. Oratokhai's lay off, there were two vacant positions within the Office of Employee and Labor Relations. Neither of these positions was eliminated with the lay off.

94. Under duress from her working conditions and the treatment she endured from Mr. Froelke, Plaintiff gave notice of her resignation in late May 2007.

95. Defendant forced Plaintiff to leave the office prior to her scheduled resignation.

## **PRAYER FOR RELIEF**

**WHEREFORE** Plaintiff Laurie C. Bay demands judgment against Defendant Washington Metropolitan Area Transit Authority (WMATA) and John B. Catoe, Jr. including compensatory damages in an amount to be determined at trial but believed to exceed Three Hundred and Fifty Dollars ($350,000.00); her cost in this action, statutory damages plus her reasonable attorney's' fees and such other relief as justice requires.

I, Laurie C. Bay acknowledge that the above information is correct and true to the best of my knowledge and information.

*[signature: Laurie C. Bay]*    12/10/07

Laurie C. Bay    Date

Respectfully submitted

*[signature]*

L. Saundra White,
Federal Bar # MD012370
3540 Crain Highway, #107
Bowie, Md 20716
(301) 574-3547
(240) 455–6491(Fax No)
E-mail: WhiteLegalGrp@aol.com